**FIRST DIVISION**
**BARNES, P. J.,**
**MARKLE and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.gov/rules**

**June 25, 2026**

# In the Court of Appeals of Georgia

A26A0588. BRIAN E. ANDERSON, JR., AN INCAPACITATED ADULT, BY HIS CONSERVATOR, KIERSTON M. PHILLIPS v. SMITH.

A26A0589. SMITH v. BRIAN E. ANDERSON, JR., AN INCAPACITATED ADULT, BY HIS CONSERVATOR, KIERSTON M. PHILLIPS.

BARNES, Presiding Judge.

This appeal and cross-appeal arise from a jury verdict in favor of Roger C. Smith on a complaint for personal injuries brought by Brian E. Anderson, Jr., an incapacitated adult, by his Conservator, Kierston M. Phillips (hereinafter "Anderson"). In Case No. A26A0588, Anderson challenges as reversible error the trial court's jury instruction on the defense of sudden emergency. In the cross-appeal, Case No. A26A0589, Smith contends that the trial court erred in denying his request

for attorney fees under OCGA § 9-11-68. Following our review, we affirm the trial court's judgment in both appeals.

"[A[fter approval by the trial court, [a jury verdict] and the judgment thereon, will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law." *Baker v. Cuthbertson*, 372 Ga. App. 753, 756 (906 SE2d 764) (2024) (punctuation omitted). So construed, the evidence demonstrated that at approximately 7:15 on the evening of December 10, 2012, Smith was driving home from work in a cargo van northbound on Highway 113 in Carrollton, Georgia. His girlfriend was sitting in the passenger seat of the van. Smith testified that he observed a car approximately a quarter of a mile away appear to maneuver to avoid something in the road ahead, and activated his high beams. Smith recounted what happened next.

> I thought maybe it was something in the road that [the car ahead] went around or, you know, something moving down the road. So I saw something glint off the pedal. And I knew– I knew, there was a bicycle there. I couldn't see it very well, but I knew it was a bicycle. So I slowed down. I moved over. ... [I moved] [t]o the left. ... I put my tires on the center line. There's a three-foot clearance. And I might not have did it perfect, but I did move over. And I'm running on about 40 to 45 miles an hour. And all the sudden [the bicyclist, identified as 17-year-old Anderson] turns. All the sudden I looked – I looked up, and he was right

2

in front of me. ... I seen his face. He was just staring. ... Until he pulled out in front of me, I never saw him. [Smith's girlfriend] yelled he's turning, he's turning. I knew he was turning, but I didn't, you know, [know] how far away he was or anything.

Smith testified that Anderson was approximately three feet away from him at that point. He described that the choices he had at that time were, "I could either go straight, I could have gone to the right, I could have gone to the left." Smith testified that had he gone straight, "I would have killed him"; if he had turned to the right, "I would have killed him"; and, he subsequently made the choice to make a "left-hand turn." Smith estimated that it was "[p]robably about 30 seconds" from the time he observed Anderson began his left turn until the impact. During cross-examination Smith was asked to watch the clock for 30 seconds and then asked if the time between the turn and impact was "that long." Smith responded that it "seemed like it," but that he did not have enough time to avoid Anderson.

Anderson was severely injured in the collision. Acting through his guardian, Anderson filed a complaint for damages incurred as a result of the accident. The case proceeded to trial and the jury returned a defense verdict in favor of Smith, which the judge subsequently entered as a final judgement. Anderson filed a motion for new trial,

in which he asserted that the verdict was "decidedly and strongly against the weight of the evidence regarding Smith's negligence," and also that the trial court erred in charging the jury on the sudden emergency doctrine. The trial court denied the motion, and this appeal ensued.

Case No. A26A0588

1. Anderson contends that the trial court erred in charging the jury on the sudden emergency defense. In the absence of a choice in the course of conduct, Anderson argues, the sudden emergency defense is foreclosed. He asserts that the evidence showed that Smith was not confronted with any other reasonable alternatives to avoid striking Anderson. Anderson notes that Smith's testimony reflected that his only choices at the time of the collision were to kill Anderson or swerve, and this presented no reasonable alternative such that the sudden emergency defense would apply.

At the charge conference, the trial court advised over Anderson's objection that it would instruct the jury on sudden emergency,[1] and later charged the jury that,

---

[1] Smith contends that Anderson forfeited any objection to the sudden emergency charge because he objected on the basis that there was no sudden emergency because Smith had 30 seconds to make a decision and the charge is warranted only when something unforeseeable, i.e, stroke or heart attack,

4

with regard to emergencies, one who is confronted with a sudden emergency that was not created by one's own fault and is without sufficient time to determine accurately and with certainty the best thing to be done is not held to the same accuracy of judgment as would be required that person if he or she had more time for deliberation. The

incapacitated the defendant. But on appeal, Smith asserts, Anderson argues that there were no alternative choices. We do not agree that the objection was forfeited. Although Anderson argued as Smith asserts, Smith responded that the charge was appropriate because Smith had to immediately choose between three alternatives when Anderson turned his bicycle in front of the van. On that basis, the trial court found the charge applicable. OCGA § 5-5-24 (a) provides that "no party may complain of the giving [of] an instruction to the jury unless he objects thereto before the jury returns its verdict, stating distinctly the matter to which he objects and the grounds of his objection." However, the requirement that objection be distinctly stated "does not demand a formalistic, technically perfect objection." *Christiansen v. Robertson*, 237 Ga. 711, 712 (229 SE2d 472) (1976). This provision has been construed to require that objections to instructions given be "stated distinctly enough for a 'reasonable' trial judge to understand its nature, enabling him to rule intelligently on the specific point." Id. *Morey v. Dixie Lime & Stone Co.*, 134 Ga. App. 928, 930 (1) (b) (216 SE2d 657) (1975) (objection to charge given sufficient where record showed court undoubtedly understood what counsel was objecting to and why he was objecting). It is clear that Anderson's objection to the charge was that there was no sudden emergency warranting the charge, and also evident that the trial court was able to consider the objection and related arguments. See *McDowell v. Hartzog*, 292 Ga. 300, 302 (736 SE2d 395) (2013) (holding that objection was preserved for appeal when the "appellants distinctly stated their objection at the charge conference, excepted to the charge as given on the same ground, and the trial court clearly understood the basis of their objection").

5

requirement is that the person act with ordinary care under, under all particular facts and circumstances surrounding the situation.[2]

Following the instructions, Anderson renewed his objection. The trial court acknowledged the continuing objection.

We will not overturn a trial court's decision to give a particular jury charge if there was any evidence presented at trial to support giving the charge. In determining whether some evidence exists to support an instruction, an appellate court is not authorized either to weigh existing evidence or to judge witness credibility as these matters are within the province of the jury.

---

[2] Smith submitted the following pattern charge:
One who is confronted with a sudden emergency that was not created by one's own fault and is without sufficient time to determine accurately and with certainty the best thing to be done is not held to the same accuracy of judgment as would be required of that person if he/she had more time for deliberation. The requirement is that the person act with ordinary care under all particular facts and circumstances surrounding the situation.

Georgia Suggested Pattern Jury Instructions, Fifth Edition, Vol. I: Civil Cases, § 60.150.

*Swanson v. Hall*, 275 Ga. App. 452, 453 (1) (620 SE2d 576) (2005) (citation modified). "A jury charge on the sudden emergency defense is authorized if the defendant presents any evidence, however slight, to support such a defense, even if there is conflicting evidence that would allow the jury ultimately to find that an emergency did not exist." *Smith v. Norfolk S. Ry. Co.*, 337 Ga. App. 604, 609 (1) (788 SE2d 508) (2016) (citation omitted). "Whether there was slight evidence authorizing a charge on the sudden emergency doctrine is a legal question," which we review de novo. Id. However, the issue of whether an emergency existed, "like all questions of diligence, negligence, contributory negligence and proximate cause except in plain and indisputable cases, [is] a question for determination by the jury." *Stephens v. Hypes*, 271 Ga. App. 863, 865 (610 SE2d 631) (2005) (citation and punctuation omitted).

> It is well established that if a defendant is confronted with a sudden emergency without sufficient time to determine with certainty the best course to pursue, he is not held to the same accuracy of judgment as would be required of him if he had time for deliberation. The sudden emergency defense is available where the evidence shows that there has been a sudden peril caused by circumstances in which the defendant did not participate and which offered him a choice of conduct without time for thought. Thus, application of the sudden emergency doctrine requires that the defendant have a choice of conduct.

7

*Rice v. Francis*, 374 Ga. App. 280, 281 (1) (912 SE2d 160) (2025) (citation modified). "The doctrine requires that the person confronted by the emergency have the opportunity to exercise one of several reasonable alternative courses of action. In the absence of such factors, there can be no conduct to which to apply the standard and the doctrine is inapplicable." Id. at 281-82 (1).

According to Anderson, Smith faced only one choice of conduct and that was to veer left. He argues that the sudden emergency defense is inapplicable, where, as here, there was no other choice, evinced by Smith's own testimony that had he proceeded straight or turned right, Anderson would have been killed. Anderson points to this Court's reversal in *Rice* upon finding error in the trial court's charge on sudden emergency defense. In that case, we concluded that,

> there is no evidence that [the defendant] had an opportunity to exercise one of several reasonable alternative courses of conduct prior to the collision. Rather, the evidence established that his only course of conduct was to attempt to stop his vehicle. [The Defendant] testified that because of heavy traffic in the lanes on both sides of him he had no areas to maneuver to change lanes, that he had no way to change lanes or move over, that it was not a reasonable choice for him to get over to the left or right, and that his only course of conduct was to slam on his brakes to

8

> stop his vehicle. Indeed, [the defendant] did not contend that he had a choice between attempting to stop and taking some other action.

*Rice*, 374 Ga. App. at 282 (1) (citation and punctuation omitted).

Contrary to *Rice*, however, here there was some evidence of an emergency presenting Smith with alternative courses of action. Unlike the defendant in *Rice*, Smith never testified that he had no alternative but to swerve left, but instead, he testified that when faced with three alternative choices, he had to quickly make a choice that appeared less hazardous to Anderson. See *Smithwick v. Campbell*, 361 Ga. App. 481, 489, 2 (b) (864 SE2d 662) (2021) (sudden emergency defense available where there is "evidence that [the defendant] faced at least two choices of conduct after the emergency arose. The trial record shows that the exit ramp was bordered by a grassy shoulder, which was apparently wide enough for [the defendant] to avoid the collision. ... Therefore, there exists some evidence that [the defendant] could have swerved onto the shoulder instead of attempting to stop."); *Maxineau v. King*, 304 Ga. App. 217, 219-220 (695 SE2d 732) (2010) (charge on sudden emergency authorized where defendant testified he chose between striking a smaller car that had pulled in front of him or moving to the left lane and potentially striking the plaintiff's truck).

When a party presents any evidence—even slight evidence—on a particular issue, a trial court does not err in charging the law on that issue. *Jimenez v. Morgan Drive Away*, 238 Ga. App. 638, 641 (2) (a) (519 SE2d 722) (1999). The evidence here constituted some evidence of an emergency, and the trial court committed no error in charging the jury on this defense.

Case No. A26A0589

2. In December 2024, before the March 2025 judgment, Smith served Anderson with an offer of settlement of $75,000. The offer specified that, "if accepted, [it] would constitute a full and complete settlement of any and all claims that have been made or could have been asserted by or on behalf of [Anderson], including but not limited to any and all medical bills, hospital bills, liens, and claims for reimbursement or subrogation." In addition, the offer stated that "[o]ne hundred dollars ($100.00) of the settlement money is allocated to settle the punitive damages claim asserted by [Anderson]" The offer also required that Anderson sign a release of all claims against Smith and indemnify Smith against any and all claims or liens arising from or relating to expenses incurred after the accident.

After the return of the defense verdict and entry of the judgment, Smith moved for attorney fees and litigation expenses pursuant to OCGA § 9-11-68 (b) (1). The statute provides that,

> [i]f a defendant makes an offer of settlement which is rejected by the plaintiff, the defendant shall be entitled to recover reasonable attorney's fees and expenses of litigation incurred by the defendant or on the defendant's behalf from the date of the rejection of the offer of settlement through the entry of judgment if the final judgment is one of no liability or the final judgment obtained by the plaintiff is less than 75 percent of such offer of settlement.

However, "[i]f a party is entitled to costs and fees pursuant to the provisions of this Code section, the court may determine that an offer was not made in good faith in an order setting forth the basis for such a determination. In such case, the court may disallow an award of attorney's fees and costs." OCGA § 9-11-68 (d) (2).

Smith asserted that his entitlement to $118,483.22 in attorney's fees and litigation expenses was warranted under the statute because the jury had returned a defense verdict of no liability, the expenses were reasonable and necessary, and the statute specifically mandated that upon the no liability judgment, "the defendant *shall be entitled*" to the attorney's fees and expenses.

11

The trial court denied Smith's motion for attorney's fees. The trial court found that the offer had only been directed to Anderson, individually, and that as Anderson was incapacitated, he was "not capable of entering into contracts, nor is he capable of accepting offers of settlement, executing a release, or executing indemnity documents." See OCGA § 29-5-21.[3] The trial court also held that under OCGA § 29-5-23, Anderson's conservator could not compromise a claim for more than $25,000 without the probate court's approval, and likewise that letters of conservatorship prohibited the disposal of Anderson's property without a court order.[4]

---

[3] OCGA § 29-5-21 provides:
(a) Unless the court's order specifies that one or more of the following powers are to be retained by the ward, the appointment of a conservator shall remove from the ward the power to: (1) Make, modify, or terminate contracts, other than the power to contract marriage; (2) To buy, sell, or otherwise dispose of or encumber property; (3) Enter into or conduct other business or commercial transactions; (4) Revoke a revocable trust established by the ward; and (5) Bring or defend any action at law or equity, except an action relating to the conservatorship.

[4] Phillips was appointed Anderson's conservator in September 2018. Pursuant to OCGA § 29-5-23 (a),
Unless inconsistent with the terms of any court order relating to the conservatorship, a conservator without court order may... (13) Compromise any contested or doubtful claim for or against the ward if

In denying the motion, the court concluded that because it was impossible for Anderson to personally accept the settlement or his conservator to accept the settlement without court approval, the offer was not a good faith offer per OCGA § 9-11-68 (d) (2). The trial court also found that Smith's offer "bore no rational relation to the amount of damages suffered by [Anderson]." In assessing whether the offer was

---

the proposed gross settlement is in the amount of $25,000.00 or less, provided that, for purposes of this paragraph, the term "gross settlement" means the present value of all amounts paid or to be paid in settlement of the claim, including cash, medical expenses, expenses of litigation, attorney's fees, and any amounts allocated to a structured settlement or other similar financial arrangement; and (14) Release the debtor and compromise all debts in the amount of $25,000.00 or less when the collection of the debt is doubtful.

OCGA § 29-5-23 (c) (5) additionally provides that the court may specifically grant the conservator on a case-by-case basis the conservator the power

[t]o compromise a contested or doubtful claim for or against the ward if the proposed gross settlement is more than $25,000.00, provided that, for purposes of this paragraph, the term "gross settlement" means the present value of all amounts paid or to be paid in settlement of the claim, including cash, medical expenses, expenses of litigation, attorney's fees, and any amounts allocated to a structured settlement or other similar financial arrangement[.]

13

made in good faith, the trial court considered the factors set forth in *Richardson v. Locklyn*, 339 Ga. App. 457 (793 SE2d 640) (2016); namely, whether the offer bore a reasonable relationship to the amount of damages, whether the offer was premised on a realistic assessment of liability, and whether the offeror lacked intent to settle the claim. Id. at 460. The trial court found that consideration of the factors weighed heavily against a finding of good faith. Specifically, as to the first factor, the trial court noted Anderson's permanent injury and the over $500,000 in medical bills, and as to the second factor, the trial court found that the facts were undisputed that Smith had "hit a child" "lawfully traveling in the roadway." According to the trial court, as to the third factor, Smith could not have reasonably anticipated that Anderson would accept or the probate court approve a $75,000 settlement, "which supports a finding that the offeror lacked intent to settle the case."

On appeal, a trial court's ruling on whether an offer of settlement under OCGA § 9-11-68 was made in good faith is reviewed for abuse of discretion. The offeree (aggrieved party) has the burden to show the absence of good faith. Relevant evidence on the absence of good faith may include, inter alia, (1) whether the offer bore no reasonable relationship to the amount of damages, (2) an unrealistic assessment of liability, or (3) that the offeror lacked intent to settle the claim.

14

*Shaha v. Gentry*, 359 Ga. App. 613, 615 (2) (859 SE2d 567) (2021).

In related enumerations of error, Smith contends that the trial court erred in finding that the offer was incapable of acceptance because neither Anderson, as an incapacitated adult, or his conservator, without the approval of the probate court, could approve the offer, and that the trial court erred in finding that the offer was not made in good faith.

Smith argues that Phillips, as Anderson's conservator, could have accepted the agreement on behalf of Anderson, and the requirement of probate court's approval did not preclude the acceptance. But, as the trial court noted, despite being aware of Anderson's incapacitation and the legal statutory limitations thereof, Smith proferred the offer to Anderson, individually. See OCGA § 29-5-21 (noting the powers removed from a ward upon the appointment of a conservator). Likewise, it is reasonable to assume that since the litigation had been pending since 2014, Smith was not only aware of Anderson's incapacity, but that Phillips had been appointed Anderson's conservator in 2018. Yet despite this knowledge, and seemingly aware of the statutory powers of a conservator, Smith determined that the offer should be made to Anderson individually. While undisputed that, as Smith argues, Anderson was the party in

interest, he offers no legal authority to support his contention that Anderson, in his individual capacity, could statutorily accept the offer of settlement, rather than his conservator.

Moreover, even assuming that the offer of settlement in that form was capable of being accepted, the trial court also found that it was not made in good faith. Once a prevailing party demonstrates, as here, that OCGA § 9-11-68 applies, the trial court "shall order the payment of attorney's fees and expenses of litigation[.]" OCGA § 9-11-68 (d) (1). However, such an award may be disallowed where the trial court finds the settlement offer was not made in good faith. See OCGA § 9-11-68 (d) (2).

> Just as the jury determines the reasonableness of an insurer's response to a request to settle within policy limits, the trial court determines the reasonableness of an insurer's offer to settle. It is a factual determination, based on the trial court's assessment of the case, the parties, the lawyers, and all of the other factors that go into such a determination, which the trial court has gathered during the progress of the case.

*Great West Cas. Co. v. Bloomfield*, 313 Ga. App. 180, 183 (2) (721 SE2d 173) (2011) (citation and punctuation omitted). See also *Anglin v. Smith*, 358 Ga. App. 38, 40 (853 SE2d 142) (2020) ("[i]n making [a] determination that [a] settlement offer was made in good faith, the trial court properly consider[s] the merits of the underlying case").

The trial court is also "required to consider the offeror's explanation and then determine whether, despite consideration of the objective factors the offeror had a subjectively reasonable belief on which to base its offer." *Richardson*, 339 Ga. App. at 461 (citations and punctuation omitted).

While the trial court is required, as Smith asserts, to consider his explanation for why he believed the offer was made in good faith, it is within the trial court's province to determine whether the belief was subjectively reasonable. See *Richardson*, 339 Ga. App. at 460.

A determination of good faith is left to the discretion of the trial court. See *Shaha*, 359 Ga. App. at 615 (2). And, on appellate review, our role is limited to determining whether the trial court exercised that discretion, and upon our review, we are not persuaded that the trial court failed to do so.

*Judgments affirmed. Markle and Hodges, JJ., concur.*